UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>Department of Justice, Antitrust Division<br>450 5th St. Street, N.W., Suite 4000<br>Washington, DC 20530,<br><br>            Plaintiff,<br><br>            v.<br><br>**RAYCOM MEDIA INC.**<br>RSA Tower, 20th Floor<br>201 Monroe Street<br>Montgomery, AL 36104,<br><br>            Defendant. | Civil Action No.:<br><br>Filed:<br><br>Judge: |

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

### I. NATURE AND PURPOSE OF THE PROCEEDING

Defendant Raycom Media, Inc. ("Raycom") and Lincoln Financial Media Company[1] ("Lincoln") entered into a Stock Purchase Agreement, dated November 12, 2007, pursuant to which Raycom acquired three broadcast television stations from Lincoln. The transaction closed on April 1, 2008. The United States filed a civil antitrust Complaint on August 28, 2008,

---

[1] Lincoln is not a party to this lawsuit.

alleging that Raycom's acquisition of one of the stations, WWBT-TV, the Richmond, Virginia, affiliate of the National Broadcasting Corporation, when it already owned WTVR-TV, the Richmond, Virginia, affiliate of CBS Broadcasting Inc., violates Section 7 of the Clayton Act, 15 U.S.C. § 18. The Complaint alleges that Raycom, as a result of the acquisition, owns two of the top four broadcast television stations in the Richmond market accounting for more than half of all broadcast television spot advertising revenue in 2008. Raycom's continued ownership of both WWBT-TV and WTVR-TV would substantially lessen competition in the sale of broadcast television spot advertising in Richmond, Virginia, and the surrounding area.

At the same time the Complaint was filed, the United States also filed a Hold Separate Stipulation and Order ("Hold Separate") and proposed Final Judgment, which are designed to eliminate the anticompetitive effects of Raycom's common ownership of WWBT-TV and WTVR-TV. Under the proposed Final Judgment, which is explained more fully below, Raycom agrees to divest WTVR-TV. Under the terms of the Hold Separate Stipulation and Order, Raycom agrees to take certain steps during the pendency of the proposed divestiture to ensure that WTVR-TV is operated as a competitively independent, economically viable and ongoing business concern, that will remain independent and uninfluenced by Raycom's other broadcast operations, and that competition is maintained between WWBT-TV and WTVR-TV.

The United States and Defendant have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.
2

## II. DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### A. The Defendant and the Transaction

Defendant Raycom is a Delaware limited liability company with its headquarters in Montgomery, Alabama. Raycom, through its subsidiaries, owns approximately 46 television stations in the United States, including WWBT-TV and WTVR-TV in Richmond, Virginia.

### B. The Transaction

On November 12, 2007, Raycom agreed to acquire three broadcast television stations in three different markets from entities controlled by Lincoln. In one of those markets – Richmond, Virginia – the acquisition would result in Raycom owning WWBT-TV and WTVR-TV, two of the top four broadcast television stations that combined account for more than 50 percent of the broadcast television spot advertising revenues in that market. Although a Federal Communications Commission ("FCC") rule against duopolies in local markets ("the FCC duopoly rule") prohibited Raycom from owning both stations, prior to closing Raycom planned to seek a temporary waiver of the FCC duopoly rule to allow the transaction to be completed, and then to divest WTVR-TV to cure the overlap.

On January 9, 2008, the United States, Raycom, and Lincoln entered into an agreement by which: the United States agreed to defer filing suit to enjoin the transaction for a period of ninety days following the closing of the Raycom/Lincoln transaction, during which period Raycom was to sell WTVR-TV; Raycom agreed that the United States could file the executed Hold Separate Stipulation and Order and a proposed Final Judgment compelling the sale of WTVR-TV in the event that Raycom did not sell WTVR-TV within that period; and Raycom agreed to comply by

the terms of the Hold Separate Stipulation and Order requiring Raycom to preserve and hold separate WTVR-TV, so that competition in the Richmond broadcast television advertising market would be maintained.

Raycom closed its transaction with Lincoln on April 1, 2008, but the agreed-upon divestiture has not yet taken place. Therefore, in accordance with the terms of the January 9, 2008 agreement, the United States instituted this action.

### C.   The Competitive Effects of the Transaction

#### 1.   *The Relevant Product and Geographic Markets*

The Complaint alleges that the provision of broadcast television spot advertising in the Richmond Designated Marketing Area ("Richmond DMA") constitutes a line of commerce and section of the country, or relevant market, for antitrust purposes. Broadcast television spot advertising comprises the majority of a broadcast television station's revenues. It is purchased by advertisers who want to target potential customers in specific geographic markets and differs from network and syndicated television advertising, both of which are sold by the major television networks and producers of syndicated programs on a nationwide basis and broadcast in every market where the network or syndicated program is aired. Spot advertising is sold either directly by the station, or through its national representative, on a localized, market-by-market basis.

The Complaint alleges that broadcast television spot advertising possesses specific characteristics, such as its combination of sight, sound, and motion, and broad reach, that collectively differentiate it from other media. Broadcast television stations are able to identify advertisers with strong preferences for broadcast television advertising, and can charge different

advertisers different prices. The Complaint alleges that if broadcast television stations were to raise the price of spot advertising, some advertisers might shift some of their advertising to other media rather than absorb a price increase. However, the existence of such advertisers would not prevent broadcast television stations from profitably raising prices by a small but significant amount for a substantial number of advertisers that would not shift.

The Complaint alleges that the Richmond, Virginia, DMA is the relevant geographic market. The Richmond DMA[2] encompasses the city of Richmond, Virginia, and the surrounding counties in which stations within the Richmond DMA receive the largest share of viewers. Advertisers use broadcast television stations within the Richmond DMA to reach the largest possible number of viewers within the entire DMA. Advertising on television stations outside the Richmond DMA is not an effective alternative for advertisers wishing to target viewers within the Richmond DMA, because such stations are not viewed by a significant number of potential customers within the Richmond DMA.

    2.    *Anticompetitive Effects of the Transaction*

Raycom's acquisition of WWBT-TV substantially lessens competition in the provision of broadcast television spot advertising time in the Richmond DMA. Raycom's ownership of WWBT-TV and WTVR-TV gives it control over two of the top four broadcast stations in the Richmond DMA and over 50 percent of the broadcast television spot advertising revenue in the Richmond DMA. Combining the ownership of WWBT-TV and WTVR-TV substantially

---

[2] A Designated Marketing Area ("DMA") is a non-overlapping geographic unit defined by A. C. Nielsen Company, a firm that surveys television viewers and furnishes television stations, advertisers, and advertising agencies in a particular area with data to aid in evaluating audience size and composition. A DMA is used to identify broadcast television stations whose broadcast signals reach a specific area and attract the most viewers.

5

increases the already high concentration in the market, which will reduce competition and lead to higher prices.

Advertisers select broadcast television stations to reach a large percentage of their target audience based upon a number of factors, including the size and demographic characteristics of the station's audience. Many advertisers seek to reach a large percentage of their target audience by selecting those broadcast television stations whose audience best correlates to their target audience. If multiple broadcast television stations efficiently reach that target audience, advertisers benefit from the competition among such stations to offer better prices or services. Today, WWBT-TV and WTVR-TV compete head-to-head to reach the same audiences and, for many advertisers that buy broadcast television time in Richmond, they are close substitutes for each other based on their specific audience characteristics. Because advertisers seeking to reach a target audience would have fewer and more expensive alternatives to the merged entity as a result of the merger, the acquisition would give Raycom the ability to raise its rates.

The Complaint alleges that new entry into the Richmond broadcast television spot advertising market is highly unlikely in response to a Raycom price increase. The FCC regulates entry through the issuance of licenses. These licenses are difficult to obtain because the availability of spectrum is limited, and the regulatory process associated with obtaining a license is lengthy. Even if a new signal became available, commercial success would come, at best, over a period of many years, because all major broadcast networks are already affiliated with a station in the Richmond-DMA, the contracts last for many years, and the broadcast networks rarely

switch licensees when the contracts expire. Thus, entry into the Richmond DMA broadcast television spot advertising market would not be timely, likely, or sufficient to deter Raycom from unilaterally raising prices.

For these reasons, the Division concluded that Raycom's acquisition of WWBT-TV, when it already owned WTVR-TV, would substantially lessen competition in the sale of broadcast television spot advertising time in the Richmond DMA, eliminate actual competition between WWBT-TV and WTVR-TV, and result in increased rates for broadcast television spot advertising time in the Richmond DMA, all in violation of Section 7 of the Clayton Act.

### III.  **EXPLANATION OF THE PROPOSED FINAL JUDGMENT**

The proposed Final Judgment requires that Defendant divest all of the tangible and intangible assets used in the operation of WTVR-TV, defined in the Final Judgment as the "Divestiture Assets." The sale of the Divestiture Assets according to the terms of the proposed Final Judgment will eliminate the anticompetitive effects of the acquisition in the Richmond market for broadcast television spot advertising time. The Divestiture Assets must be divested in such a way as to satisfy the United States in its sole discretion that WTVR-TV can and will be operated by the acquirer as a viable, ongoing commercial broadcast television business; and Defendant must take all reasonable steps necessary to accomplish the divestiture quickly and shall cooperate with prospective acquirers. The divestiture will establish a new, independent, and economically viable competitor.

Unless the United States grants an extension of time, Raycom must divest WTVR-TV either within thirty (30) calendar days after the Complaint has been filed or within five (5) days after notice of entry of the Final Judgment, whichever is later. The United States may, in its sole

discretion, grant one or more extensions of time, which in total may not exceed sixty (60) calendar days. Until the divestiture takes place, Raycom will maintain WTVR-TV as an independent competitor to the other broadcast television stations in the Richmond DMA, including WWBT-TV. WTVR-TV must be divested in such a way as to satisfy the United States in its sole discretion that it can and will be operated by the purchaser as a viable, ongoing business that can compete effectively in the relevant market. Raycom must take all reasonable steps necessary to accomplish the divestiture quickly and shall cooperate with prospective purchasers.

    If Raycom fails to divest WTVR-TV within the time periods specified in the Final Judgment, the Court, upon application of the United States, shall appoint a trustee nominated by the United States and approved by the Court to effect the divestiture. If a trustee is appointed, the proposed Final Judgment provides that Raycom will pay all costs and expenses of the trustee and any professionals and agents retained by the trustee. The compensation paid to the trustee and any persons retained by the trustee shall be both reasonable in light of the value of WTVR-TV and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished. After appointment, the trustee will file monthly reports with the United States and the Court, setting forth the trustee's efforts to accomplish the divestiture ordered under the proposed Final Judgment. If the trustee has not accomplished the divestiture within six (6) months after its appointment, the trustee shall promptly file with the Court a report setting forth (1) the trustee's efforts to accomplish the required divestiture, (2) the reasons, in the trustee's judgment, why the required divestiture has not been accomplished, and (3) the trustee's recommendations. At the same time, the trustee will

furnish such report to the United States, who will have the right to make additional recommendations consistent with the purpose of the trust. In such a situation, the Court may enter any order(s) it deems appropriate to carry out the purpose of the Final Judgment.

The proposed Final Judgment requires that Raycom maintain and operate WTVR-TV separate and apart from Raycom's other operations, pending divestiture. The Final Judgment also contains provisions to ensure that WTVR-TV will be preserved, so that after divestiture it will remain a viable, aggressive competitor.

## IV. REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against Defendants.

## V. PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the United States Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

>John Read
>Chief, Litigation III Section
>Antitrust Division
>United States Department of Justice
>450 5th St., N.W., Suite 4000
>Washington, DC  20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI. ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against Defendant. The United States could have continued the litigation and sought preliminary and permanent injunctions against Defendant's acquisition of WWBT-TV.

The United States is satisfied, however, that the divestiture of assets described in the proposed Final Judgment will preserve competition for the provision of broadcast television spot advertising in the relevant market identified by the United States. Thus, the proposed Final Judgment would achieve all or substantially all of the relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

## VII. STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the

defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act).[3]

As the United States Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62. With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001). Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is *"within the reaches of the public interest."* More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

---

[3] The 2004 amendments substituted "shall" for "may" in directing relevant factors for court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns*, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[4] In determining whether a proposed settlement is in the public interest, a district court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States' prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would

---

[4] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

have imposed a greater remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459-60. As this Court recently confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). The language wrote into the statute what Congress intended when it enacted the Tunney Act in 1974, as Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of

Senator Tunney). Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11.[5]

### VIII. DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: August 28, 2008

Respectfully submitted,

/s/ Ann Marie Blaylock
Ann Marie Blaylock (D.C. Bar No. 967825)
Trial Attorney
United States Department of Justice
Antitrust Division
Liberty Square Building
450 Fifth Street, N.W., Suite 4000
Washington, D.C. 20530
(202) 616-5932
Facsimile: (202) 514-7308
ann.blaylock@usdoj.gov

---

[5] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances."); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2008, I caused a copy of the foregoing Competitive Impact Statement to be served on the defendant in this matter in the manner set forth below:

By facsimile and U.S. mail:

Counsel for Defendant Raycom Media, Inc.

Everett J. Bowman, Esq.
Robinson Bradshaw & Hinson
101 North Tryon St., Suite 1900
Charlotte, NC 28246
Telephone: (704) 377-8329
Facsimile: (704) 373-3929
Email: ebowman@rbh.com

/s/ Ann M Blaylock
Ann Marie Blaylock (D.C. Bar. No. 967825)
Litigation III Section
Antitrust Division
United States Department of Justice
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
(202) 616-5932
Facsimile: (202) 514-7308
ann.blaylock@usdoj.gov